Next case is Manatech, Inc. v. Wellness Quest and Holly Reginald McDaniel, 2016, 1295, Ms. Stafford. Thank you, Your Honor.  Nicole Stafford, representing appellants. Your Honors, this case is a textbook example of a patentee improperly attempting to expand the scope of the claims through claim construction beyond their plain and ordinary meaning without sufficient basis in the intrinsic record to do so. Under Manatech's broad construction, which the District Court adopted, an isolated and purified acetylated mannose could be in monomeric form or could be part of an oligomer or polymer and need not be isolated or purified at all. As explained in appellant's briefing, the District Court's claim constructions are erroneous for multiple reasons. Today, I'd like to focus on three specific points. First, the District Court erred in construing acetylated mannose by relying on general statements about saccharides and sugars in the specification that the District Court admits in its Markman order at APPX do not provide a definition of the term acetylated mannose. General statements matter, don't they? They're in the specification and the statement of acetyl mannose is accompanied by including polysaccharides and oligosaccharides. Well, the general statements in the specification never speak to what acetylated mannose is and do not speak to what an isolated and purified acetylated mannose is. These statements just generally say an embodiment of the invention includes the use of saccharides, which may be in monomeric, oligomeric, or polymeric forms. In other places, they say that saccharides can be found in nature in monomeric, oligomeric, or polymeric forms. The fault with the Manatex construction that the District Court adopted is they followed this faulty logic where the specification says saccharides may be in monomeric, oligomeric, or polymeric forms and or in derivatized or underivatized forms. Then they say that acetylated mannose is a saccharide and then they reach the faulty conclusion that because acetylated mannose is a saccharide, it must exist and must be included in monomeric, oligomeric, polymeric forms. And what they leave off is, of course, the other general statement that's included throughout the specification, derivatized or underivatized forms. A lot of these forms are mutually exclusive. You can't both be derivatized and underivatized at the same time. You also can't both be a monomer and a polymer at the same time. The problem that the patent was drafted to include all possibilities. Well, I think the patent was drafted that way. And so the District Court grabbed the use of these terms and now you're saying the court should not have done that. The court should not have done that. The patent was drafted broadly with respect to a lot of different aspects and embodiments that included saccharides that could be in all these different forms. The patent wasn't drafted to include that acetylated mannose, which is a specific chemical compound, a monomer, could be in all these different forms. And, in fact, there are a number of different examples. Isn't your proposal – aren't you reading Examples 3 and 5 completely out of the specification when you do this? No, Your Honor. Examples 3 and 5 merely include different embodiments. And they say, for example, they can include a list of different naturally occurring substances. None of those examples speak to what is isolated and purified. And none of them speak to what is acetylated mannose. I mean, you sort of merge your two arguments. You're saying, well, that it's got to be limited to its monomer because otherwise it's not isolated and purified. So, I mean, it's true that with respect to the first question, isolated mannose, that there are references throughout the specification to the various forms, right? No. Acetylated mannose, its plain and ordinary meaning, is simply a monomer of mannose that has been derivatized within acetyl group. And, in fact, if you look at – I'm looking at Column 8, Line 11. It says acetylated polymannose. So, obviously, polymers of acetylated mannose were included. So, this is Column 1? Column 8, Line 11. Column 8, Line 11. Well, it's our position that acetylated polymannose is different than acetylated mannose. If you look at Claim 8 of the 431, that confirms that. Claim 8 says, in pertinent part, wherein the acetylated mannose is obtained from the group consisting of aloe vera and acetylated polymannose. According to the District Court's claim construction, it should say, wherein the acetylated mannose is or comprises aloe vera and acetylated mannose, polymannose. Those are two different things. I'm looking at Column 6, Lines 40 et sec. It talks about synthetic monomeric, oligomeric, and or polymeric forms of acetylated mannose. So, why was it so wrong that the District Court interpreted acetylated mannose to include polymers as well? Well, as the District Court acknowledges in its Markman order, that's not a special definition of acetylated mannose. And if the patentee is not acting as its own lexicographer, you have to go back to its plain and ordinary meaning. Moreover, that list says and or, and it doesn't just list acetylated mannose. It lists gum gatsy, gum tragacanth, glucosamine, cornstarch, and arabinogalactan. What about separated and isolated? That's your second point. Yes. So, going to the second point of separated and isolated, we believe that the District Court erred by failing to give meaning to both terms. Specifically, the District Court fails to give any meaning to the term purified. Moreover, the District Court fails to give proper weight to the prosecution history of the 807 patent, which is the parent of both of the 431 and the 220 patents. And that is the prosecution where isolated and purified was first introduced into the claim to distinguish prior art. Now, the term isolated and purified exists nowhere in the specifications. It was introduced into the claims about four or five years into prosecution of the 807 patent. If that's an uncertain term, who's responsible for it being introduced into the claims? The patentees. Of course. They introduced it. And so I think that when you're construing what that means, you have to look at the specific file history associated with that. But you're arguing now that it's isolated from other saccharides. Well, they're arguing it's not isolated from other saccharides. They're arguing that it just means that it's isolated from something that's unwanted. We think that's a problematic construction because it gives no meaning, even though this was a critical element that was added to distinguish prior art. Moreover, when that term was added into the claims, the examiner rejected the claims as written description and said specifically that the generic disclosures, and those are the same disclosures that you're pointing to that are relied upon by the district court in Manitech, did not provide written description for the newly claimed genus comprising nutritionally effective amounts of isolated and purified specific saccharides. And that's at APPX 6235 and 6236. Now, in response, the applicants did not disagree and say, oh, no, that generic disclosure there, it supports isolated and purified acetylated mannose and other specific saccharides. They merely pointed to example two solely to support this limitation. And they said specifically, the present application includes an example directed to a composition of individual sugars, implying that the isolated and purified language when it's applied to specifically identified saccharides is denoting individual sugars and not in all these other forms. And they said specifically, please see example two, which is directed to a composition that includes 25 kilograms each of, and then lists eight different saccharides, which would have to be isolated and purified at some point. And this is from the APPX 6229. And so the district court totally ignored this file history. And this is the critical file history that is when the PTO eventually allows isolated and purified to come in as a claim concept. Now, they want to point to examples three and five. But the file history that relies upon examples three and five was added after the claims had already been allowed in a 1.312 amendment after allowance. And all they told the patent office there is they'd already gotten claim one allowed, which had the isolated and purified acetylated mannose, the isolated and purified other saccharides. And they said we're just adding dependent claims that are narrower in scope. And then they said in support of those claims, here's examples three and five, and here's some other language. And if you want to read what they're saying is consistent with the previous file history, I think you read that those examples three and five, which referenced the earlier examples, could show where you could get sources of additional saccharides. But it's our view that really you should focus on example two and the specific file history in the 807, where it was directly addressed that these generic disclosures that they're pointing to now, that the district court relies upon, do not support isolated and purified specifically identified saccharides. Can you address the following confusion I have a little bit? And this has to do with the isolated and purified. The composition that is claimed is a composition in which the mannose piece and the saccharides are together. At that point, mannose is not separate from the saccharides. So your view is that the claim, although it claims a composition in which these things are together, implicitly refers to some earlier period of time. Is it sort of temporal dependent at which at some earlier period of time the things were separate? If I understand your question correctly, I think the answer is yes. Because the claims are to a combination of different isolated and purified specific saccharides. And the reason this is important- But they're not process claims. They can be infringed by a composition in which the saccharides and the mannose are together. Yes. And I guess it seems to me funny or odd or something to introduce into that composition claim an interpretation that says whether or not the very same composition in which the things are together is covered by the claim depends on where the components once were in the past. Well, I think that that's because of the file history that was associated with getting those claims allowed. So isolated and purified was added in part because of prior art that was nutraceutical-based prior art. And so one of those pieces of prior art that we focus on expressly in our briefing, but there's others, is Campbell. And Campbell is an additive that was given to animals as a nutritional supplement that included a seaweed extract. And that seaweed extract is expressly identified in Campbell as including six of the list of specifically identified saccharides in combination with aloe vera extract. And both of those things were substances that had been processed and that had removed unwanted substances. But when you combine those two together, which is in Example 3 of the Campbell prior art reference, then you get basically the claims under the district court's claim construction. And it snares the prior art. Basically or exactly? You get exactly. You get exactly. My language could have been better. But you get exactly the claims under the district court's claim construction. And we are allowed under Diamond Scientific, despite the fact that one of the appellants is in privity with Manatech, to point out the prior art, particularly prior art in this case that was distinguished expressly during prosecution, to urge a narrower construction. Because the issue is not that we use acetylated mannose. The issue is that we use, just like Campbell, an aloe vera extract process. And so the issue is whether or not you can say that seaweed is isolated and purified, a list of five different specific saccharides, and whether you can say that aloe vera leaves or aloe vera extract is the same thing as isolated and purified acetylated mannose. And we think that under this court's precedent and under what those terms should mean in their ordinary language, as well as in view of the intrinsic record, that you can't do that. And you should reverse the district court's decision and remand this for further proceedings. Thank you very much. I'll reserve the rest for Margaret. We will save it for you. Mr. Pinker. May it please the court. My name is Eric Pinker. I'm here with Jared Eisenberg representing Manatech, the appellate. This case involves appellant's attempt to dramatically narrow the scope of a patent on which he was an inventor in order that he can compete against that patent and against the owner of the patent for whom he developed it. Can you start with the prosecution history disavowal that your friend on the other side just finished with? Yes. As to isolated and purified, I take it? Yes. As to isolated and purified, clearly it was added later during patent prosecution history. We believe that term is described through the specification, the meaning of it, the import of it is described through the patent specification. I would hasten to add that as it relates to the 220 patent, which is one of the two at issue, the actual definition from a prior litigated case is in and is part of the prosecution history. And as such, that term is literally defined through a Markman hearing claim construction as part of the term. But the court didn't really rely on that. The court noted that it's not bound by that, right? And neither would the PTO be bound by that. Well, I don't think it's a question of binding the PTO. I think it's a question of providing notice to the public as to the inventor's intent and understanding as well as the patent examiner's understanding of how that term was being used in this patent. It is the same and perhaps more specific than a dictionary definition in this case because here we had a court decision that was final and binding, ruling that isolated and purified meant separate from unwanted substances, filed of record as part of the prosecution history for the 220. So I think it is even better than having filed a dictionary definition because it's specific to this patent specification and specific to this phrase, not just words in isolation or in the abstract. What's your response to the argument that we should use Example 2 as the only basis for isolating and purifying? Example 2 is simply that. It's an example of which there are others. There is nothing—their argument is essentially that the reference to Example 2 is a disavowal of everything else and specifically Examples 3 and 4. This circuit has been clear that disavowals have to be clear and unambiguous. And by simply referring to Example 2, which I submit is the most extreme isolation and purification, it by no means disavowed and waived any reliance on the other examples or the other parts of the specification of which there are many that refer to mono, oligo, and poly. I'd refer the court specifically, I guess, to two things in that regard. Number one, two years after referring to Example 2, which was done in 2004 and which they claim limits us only to Example 2, two years later we cite to Examples 3 and 5 in connection with adding what became Claims 5, 6, 7, 8, and 9 of the 431 patent. That is diametrically inconsistent with the notion that there has been a clear and unmistakable disavowal. The second thing I would refer Your Honor to is Column 8, Lines 63 through 67 of the 431 patent, which is the one that we're all citing to. Those lines talk about how gum tragacanth and gum guar shall be considered as providing and it lists a series of six individual saccharides. And so, again, that is a clear and unmistakable statement that by referring to the sources and referring to the complex polysaccharides, we are intending to satisfy the saccharides in their individual named way in connection with the claims. I hope that answers Your Honor's question. Can you address this question about Campbell? Yeah, absolutely. And put aside the argument that that issue is unavailable because of a sign or estoppel. Just assume that I'm not buying that. So I'm trying to figure out, Campbell is a piece of prior art that is discussed in the patent. I mean it's cited in the patent and I guess it was discussed in the prosecution history. It was discussed in the prosecution history. I'm not sure if it was in the patent. And tell me why if that – it's cited in the patent. It's certainly prior art in the patent and it was decided in the history absolutely. Right, right. So doesn't it seem, I guess, significant that the claim construction that was adopted here is one that would have the claim read on a piece of prior art that was part of this prosecution? I think as Your Honor said it, it would. It seems that way, but I think it is not that way. The real problem we have here is that we are injecting validity into the appeal of claim construction. Assume I think that that's okay. I understand that. And my point would simply be I didn't have an opportunity to develop a record on validity. I do not believe in any way, shape, or form Campbell aggresses the integral and necessary limitation of nutritionally effective. I do not think Campbell speaks to the limitation of a dietary supplement. But I have not had an opportunity to present evidence on that, to obtain expert witnesses on that, to take depositions on that because literally validity was never a part of the proceedings below. And so what we have is a very small and I would say unfocused snapshot attack on validity. You haven't seen any claim charts. We have ignored certain limitations in the claims themselves. All of that seems to me like in the abstract. I look at Campbell and it seems to me this is good for the animals, nutritionally effective. What's the problem with that? And this, is it the 431? Anyway, the patents that issue at here, I think in the abstract, talks about mammals. It's not just humans. So what is even the glimmer of an opening for saying Campbell wouldn't be, that the claim as construed by the district court wouldn't read on Campbell? Yes, Judge. The two things I would cite to the court is number one, while Campbell uses the word nutritional, the patents here use the phrase nutritionally effective amounts, which is a defined phrase,  defined where? If I go to the 431 patent, Judge, it is defined column 10, line 22, and it goes on for a paragraph. So there is a nutritionally effective element requirement, which has in prior cases been attacked. It's not much of a definition, right? Nutritionally effective amount has meant that amount, which will provide a beneficial nutritional effect or response in a mammal. And we have defended that in past cases with expert testimony and have satisfied validity challenges, lack of description challenges, vagueness challenges, and have surpassed those in two prior cases. And my point simply to Your Honor is to raise it now in the first instance deprives me of the ability to answer a lot of your questions with specific factual sites because I wasn't given that opportunity. So number one, I would cite nutritionally effective amount. Number two, a dietary supplement composition. Number three, I believe that Campbell really was directed to an animal feed rather than a dietary supplement for humans. And those are the things that I would challenge in an evidentiary hearing if I had an opportunity to do that. Fundamentally, the problem here is that they are arguing something that they have no right to argue because of a sign or estoppel and which was not properly raised at the trial court level because we were dealing solely with claim construction. Let's explore that. Why in the world would a sign or estoppel prevent a litigant from saying, this claim should not be construed in the following way because then it would be invalid? Well, we sold them. That was perfectly valid. We're not questioning that. We're not impugning our own sale of something that we represented as implicitly represented as valid. But we're saying it's not that broad. I understand what Your Honor is asking, and essentially they're saying we can't raise validity, but we're going to argue it for the purpose of getting a different claim construction. And I simply think that to the extent they want to make that argument, I guess they have. They are not permitted to assert validity, and as a result, I am to some large extent handcuffed in terms of the evidence available to me to respond to a validity challenge. As to claim construction, you would only get to make the argument about validity if, in fact, there was some initial ambiguity in the claim construction. If the terms are clearly defined or if the intrinsic evidence is such that you can get an actual definition from the intrinsic evidence without ambiguity, then whether there is validity arguments or not is not relevant to the claim construction. We have to construe the claims as written, consistent with the claims, consistent with the specification. And if it turns out that there is a validity issue, I don't think there is, but then we deal with that separately. My concern here is that there is no such inconsistency or ambiguity unless you introduce the extrinsic evidence, which is designed to create an ambiguity, quite frankly. Can you address the claim differentiation argument as it relates to claims 1 and 9? Yes. Claim 1 as... let me start with claim 9. Claim 9 appends the limitation that the acetylated mannose and other saccharides can be in mono, oligo, and poly saccharide form. Obviously that requires then that it has to be equal to or narrower than, dependent upon the first claim, claim 1. We believe that it requires at a minimum that the acetylated mannose and other saccharides can be in mono, oligo, and poly form. They can also, as my friend across the aisle said, be in derivatized and or under-derivatized form, but that is not part of the additional limitations imposed by claim 9. So you're just essentially conceding that it's redundant of claim 1. I think at this point, Your Honor, it likely is redundant. I do think that. I think it is coextensive is perhaps the word I would have chosen to use, but I think it does not meaningfully narrow the scope of claim 1. I do think, however, it communicates quite loudly that claim 1 must necessarily include acetylated mannose in both a monomeric form and as a constituent part of an oligomer or polymer. Otherwise it would be an improperly dependent claim. Correct. Thank you. I do want to make sure I've addressed just a couple of things. I'd like to direct the court to really going back to my first point. This is an attempt to narrow dramatically the scope of a patent. This patent has been construed now on two prior occasions by two different judges in the Northern District. It has been construed entirely consistent with this. I recognize that this court conducts a de novo review, but I would submit that those prior decisions are both persuasive in their reasoning and provide public notice and uniformity. This court's constructions are consistent with those prior constructions. The appellant's arguments are not. Their attempt here is quite literally as the trial court observed their attempt, and I'll paraphrase from page 11 of the appendix, which is the trial court's decision. What appellants are really trying to do without explicitly saying so is require compounds to be essentially 100% pure, require individual saccharide monomers, and claim limitations reciting mixtures to require them to be separated from others. That simply goes against most of the language of the specification, which talks about providing these saccharides in natural form, which provides examples of that, which talks about monomers. What do unwanted substances mean? Meaning just separating from the original source? In the dietary supplement industry, I think it really means removing the rind, the skin. Right, so the original source material. Separating the compounds you're looking at from the original source material. It would be the things that grow in nature, but we're not talking about absolute 100% purity as is made. But wouldn't that be a little clearer than unwanted substances? I frankly think unwanted substances is a skillfully done construction that was done first by Judge Kaplan in the first case and adopted by two later judges because I think it communicates the breadth of the patent as intended by the patentee and as accepted by the examiner. I thank you for your time, and if there are no more questions, I will cede what little time I have remaining. Thank you, Mr. Pinker. Ms. Stafford has a little rebuttal time. Thank you. Do you all have any particular questions you'd like me to address first? First, with respect to the claim differentiation, I think we're in agreement that it's a redundancy. It's an improper dependent claim. I don't think that that warrants for adopting their construction versus ours because some of the examples of the saccharides that are identified in Claim 1 are monomers, like acetylated mannose, and others are polymers, like a ribonogalactan, and so it just merely means that the saccharides have to be in one of those forms, not all of those forms apply to all of the saccharides identified. With respect to the filing of the markment and whether that should be some sort of a special definition, that's totally improper. It was done after issuance of the asserted patents. There was no unequivocal statement that said the patentee was accepting these constructions.  and not giving us our opportunity to be heard because all a patentee would do is sue somebody, get somebody small, get a favorable construction, run to the patent office, file it in the file histories, and then all of a sudden everybody else in the industry has to stop to ever present its own constructions. We think that's not proper. They're claiming that there's not some sort of a disavowal, and I think they're misunderstanding our argument based on the file history. We're not claiming necessarily there was a disavowal, but there was an acquiescence. The examiner said these generic disclosures of what saccharides and what forms they can be in is not support for isolated and purified with respect to individual saccharides, and they didn't argue to the contrary. And with respect to examples 3 and 5, not every embodiment has to be covered by every claim, and there's a number of patents that have been prosecuted and appended. Moreover, the specification in these examples are drafted before the give and take with the patent office, so it's not necessarily that there's anything inconsistent with those examples not being included. Moreover, the reference to those examples as providing support for these other claims was much later in support of dependent claims, including Claim 9, which we've now indicated is at best a redundancy. With respect to Campbell, there was a lot of discussion about whether or not they were given an opportunity to address. The file history associated with the 807 patent and these rejections was addressed below. It was addressed in the briefing. In general, it may not have focused on Campbell, but they were given the opportunity. And if you look carefully at the claim distinctions between Campbell and as construed by the district court and the asserted claims, there is none. They are providing nutritionally effective amounts. They are providing the isolated and purified saccharides according to the district court's construction. And therefore, we're not claiming the claim's invalid. We're claiming that that means that that can't be a proper construction and you should reverse the district court's construction. Thank you very much for your time. Thank you, counsel. I guess we can say this is a sticky case. Not sweet, but sticky.